1820.

BAYARD
v.
HOFFMAN.

---

BAYARD and others *against* HOFFMAN and others.

A voluntary settlement, either of lands or chattels, by a person indebted at the time, is void as against creditors.

Whether the statute of frauds, (13 *Eliz.* c. 5. 1 *N. R. L.* 75. 10 sess. c. 44.) applies to a settlement of that kind of property which could not be reached by legal process, if no settlement had been made, such as *choses in action, money in the funds, stock ?* &c. *Quære.*

An assignment by a debtor of " all his estate, real and personal, and of all books, vouchers, and securities, relative thereto," in *trust,* for the benefit of all his creditors, passes all his estate and interest, equitable as well as legal, and his rights in action, or as *cestui que trust,* and, therefore, includes *stock* of the *United States,* before voluntarily assigned, when the debtor was insolvent, in trust for the benefit of his wife and children ; and the trustees under the voluntary settlement, were *decreed* to hold the stock subject to the order and disposition of the trustees of the creditors under the general assignment.

July 5th.

*WILLIAM OGDEN,* one of the firm of *Murray & Ogden,* purchased public stock of the *United States,* to the amount of 11,979 dollars and 22 cents, with his own monies, derived from his wife's estate. The house of *M. & O.* were utterly insolvent, when the purchase was made, and the interest of the stock was pledged to Mrs. *Murray,* his wife's mother, for life, and the stock was placed under her control,

the better to secure the payment of that interest. After-wards, on the 10th of *May*, 1817, the stock was voluntarily, or without any valuable consideration, assigned by *Ogden*, so far as respected his reversionary interest, to the defend-ants, *Martin Hoffman* and *William Creighton*, in *trust*, for the benefit of his wife and infant children. The motive of this assignment was not impeached, as it was then supposed, that the estate of *M. & O.* would be adequate to the pay-ment of their debts. On the 28th of *January*, 1818, *M. & O.* proposed to make a general assignment of their proper-ty, upon trust, for the payment of their debts, and in the in-ventory of the property to be assigned and exhibited to their creditors, the above mentioned stock, subject to the life estate of Mrs. *M.*, who was aged, was included, and the settle-ment, by *O.*, of the reversionary interest on his wife and chil-dren was not disclosed, or known to the creditors, as it was supposed the voluntary settlement would not be valid against that subsequent assignment. The general assignment was, accordingly, made on that day, to the plaintiffs, *William Bayard* and *Henry Barclay*, in *trust*, for themselves and the other creditors. The two defendants, who are assignees for the benefit of the wife and children, refused to recognise the title to the reversion of the stock claimed by the trustees for the creditors; and they and the guardian *ad litem*, for the children, submitted to the direction of the court, and claim-ed to hold under the prior assignment.

There was no actual fraud suggested in the pleadings, and it was contended, on the part of the plaintiffs:

1. That the voluntary assignment of the stock, while *Ogden* was indebted and insolvent, was void in law:

2. That the plaintiffs, *B.* and *B.*, are to be considered as *bona fide* purchasers, without notice of the trust created by the previous voluntary assignment, and that the volun-tary settlement is void, as against them.

The defendants insisted that the stock, as a *chose in action*, is not subject to process at law, nor to the debts of credi-

1820.

BAYARD
v.
HOFFMAN.

tors, and that the voluntary settlement of it, is not within the statute of frauds.

*T. L. Ogden*, for the plaintiffs, cited 1 *Johns. Ch. Rep.* 261. 3 *Johns. Ch. Rep.* 481.

*D. B. Ogden*, for the defendants, cited 2 *Atk.* 600. 1 *Ves.* jun., 198. 9 *Ves.* 189. 10 *Ves.* 368. *Atherley on Marriage Settlements*, 220, 221.

THE CHANCELLOR. The only difficulty in this case, arises from the nature or quality of the property contained in the settlement. It is the declared rule of the Court, (*Reade* v. *Livingston*, 3 *Johns. Ch. Rep.* 481.) that a voluntary settlement by a person indebted at the time, is void, as against antecedent creditors; I consider the principle as equally applying, whether the property consists of lands or chattels; and that the creditor may follow the property into the hands of the volunteer. This is admitted to be the general rule, but, as an exception, it is stated, (*Atherley on Marriage Settlements*, 220, 221. *Roberts on Fraudulent Conveyances*, 421, 422.) that the statute of 13 *Eliz.* does not extend to voluntary settlements of property which a creditor could not reach by legal process, in case no settlement had been made, such as *choses in action*, money in the funds, &c., and, therefore, a voluntary settlement of *that species of property*, must be good against creditors, even if made by an insolvent debtor. The settlement, it is said, cannot be injurious to the creditor, nor within the purview of the statute, since, if the settlement was set aside, the property could not be touched by the creditor, as no process of execution in law or equity can reach it. The statute of 13 *Eliz.* did not enlarge the jurisdiction of any Court, by furnishing new remedies. It only avoided the voluntary transfer, as against creditors, and left them to pursue the

property in the ordinary course under the existing reme-
dies.

There is much plausibility in this reasoning, yet I
should be sorry to find it to be the settled doctrine of the
Court.   It seems to be too encouraging to fraudulent aliena-
tions; and a debtor, under the shelter of it, might convert all
his property into stock, and settle it upon his family, in de-
fiance of his creditors, and to the utter subversion of justice.

If we look into the adjudged cases on this point, it will at
once be perceived, that there is a great contrariety between
those decided in the time of Lord *Hardwicke,* and his imme-
diate successor, and those arising since.   The subject is
worthy of examination; and even if the doctrine of the latter
cases is to prevail, I apprehend that the settlement in the pre-
sent case may be questioned, and the stock appropriated
to the use of the creditors, without interfering with any of
the opinions.

The case of *Taylor* v. *Jones,* (2 *Atk.* 600.) decided by
*Fortescue,* the Master of the Rolls, in 1743, contains the
great and leading doctrine in support of the creditor.   A
bill was filed to have the debts of the plaintiff paid out of
stock comprised in a voluntary settlement, and vested in
trustees for the benefit of the defendant, for life, of his wife
for life, and then for the benefit of his children.   The money
so vested was a legacy left to the husband after marriage.
The settlement was made in 1734; and in 1741, the defend-
ant gave warrants of attorney to confess judgments, and
there was a letter of license given to the husband, but by
agreement, it was not to prevent the creditors from proceed-
ing against his effects.   The Master of the Rolls held the
settlement fraudulent and void, under the 13 *Eliz.* as to cre-
ditors, both before and after the marriage; and he decreed
*the trust estate* (the stock) *to be sold and applied to the pay-
ment of the creditors.*

This decision appears to be so reasonable and just, that I

should be very much inclined to follow it, if it has not been directly and absolutely overruled.

In *King* v. *Dupine*, (cited in the note to *Taylor and Jones*, and decided in 1744,) Lord *Hardwicke* went further, and in an ordinary case, where there was no fraudulent settlement in the way, aided the execution at law, so as to enable it to touch stock, to satisfy creditors. The defendant was entitled to the reversion of four exchequer annuities, which were vested in trustees, and of which he was only a *cestui que trust* in reversion. The plaintiff had obtained judgment at law, and the sheriff under a *fi. fa.* had seized the reversion of those four annuities, and made an assignment of them to *W.*, in *trust* for the plaintiff. But the proper officer refusing to register the judgment and assignment, the plaintiff filed her bill, and the point was, whether the sheriff could seize the reversion of these annuities, and assign them. Lord *Hardwicke* decreed, that the trustees and *W.* should assign their reversionary interest and estate in the annuities to the plaintiff, and that the requisite entries should be made at the exchequer, to entitle the plaintiff to the benefit of the reversion.

This last case does not appear to have been known to Lord *Thurlow*, or Lord *Eldon*, for it is not alluded to in any of their discussions; yet Mr. *Sanders*, the editor of *Atkins*, cites the register books for the decree.

Indeed, this power in the Court to aid the creditor at law, in his execution against property not ordinarily within its reach, seems to have been the received and unquestioned doctrine in the time of Lord *Hardwicke*.

Thus, in *Horn* v. *Horn*, (*Amb.* 79.) a bill was filed to aid an execution at law, by subjecting stock belonging to the defendant, and standing in the name of trustees, to the payment of the debt. The bill was dismissed *without costs*, because the plaintiff had, pending the suit, taken the defendant's person on execution at law. The Lord Chancellor evidently assumed the right and propriety of granting the

relief sought for, " of extending the power of the Court to reach what the common law could not," had not that circumstance intervened ; and the reporter adds, in a note, that if the plaintiff had not taken out a *ca. sa.* the bill to subject the stock in the hands of trustees had been proper.

Lord Keeper *Northington,* in *Partridge* v. *Gopp,* (*Amb.* 596. 1 *Eden.* 163.) went a step further, and reached even money in the hands of the donee. An insolvent executor had given 500 pounds to each of his two children, and after argument, and much consideration, the gift of the money was declared fraudulent within the 13th of *Eliz.,* and liable to be refunded. He declared the doctrine to be, that no man had such a power over his own property, as to be able to dispose of it, so as to defeat creditors, unless for consideration. That the statute extended to all cases, unless the alienation was *bona fide,* and made upon good consideration ; and that blood was held not to be a good consideration within that statute. That the validity of the alienation depended on the motive of the giver, and not on the knowledge of the receiver. That every man ought to be just before he is generous ; and volunteers were responsible under the statute, to the creditors of the giver, though not to the giver himself. He concluded, that *if the defendants had stood in the capacity of donees only, the gift would have been void, and they must have refunded, at the peril of their liberty, if the money had been spent ;* but as they were legatees, as well as donees, they had a right to retain in part of their legacies.

Here is a succession of three solemn adjudications, (without noticing the case of *Horn* v. *Horn,*) which establish, that property not tangible by *fi. fa.,* at law, will be reached by this Court, and that too, whether such property does or does not rest upon a voluntary settlement, fraudulent and void under the statute of *Elizabeth.* It may now be pertinently asked, when and where have these decisions been overruled ? I have not discovered any thing weightier than a *dictum* or doubt of Lord *Thurlow,* repeated in subsequent cases.

In *Dundas* v. *Dutens*, (1 *Ves.* jun., 196. 2 *Cox*, 235.) the bill, among other things, prayed that certain stock settled upon the wife might be sold, and the proceeds applied to satisfy the creditors, and Lord *Thurlow* asked, if there was any case where a man having stock in his own name, has been sued for the purpose of having it applied to satisfy creditors. If the Court was of opinion that there was any lien upon the stock, by reason of the letter of license, in the case in *Atkyns*, by which it was capable of being affected, there might be foundation for it, but if not, it was quite new to him that Chancery could touch the stock ; and he said, that " whenever it became necessary to consider the question what equity the plaintiff had against the fund or stock, he should hesitate sometime before he followed the cases of *Taylor* v. *Jones*, and *Horn* v. *Horn*."

It may be here observed, that the Master of the Rolls, in *Taylor* v. *Jones*, did not go, as Lord *Thurlow* intimates, upon the ground of an existing lien upon the stock. " The great question was," he said, " if this deed be fraudulent ? For, if it is, whether the creditors have any specific lien, is not material."

In *Caillaud* v. *Estwick*, (1 *Anst.* 381.) a bill was filed to assist a judgment creditor of Lord *Abingdon*, who had assigned his life estate in a lease subsequent to the creation of the debt, in trust, to receive the rents and profits, and pay a moiety to certain scheduled creditors, (of which the creditor in that case was not one,) and the other moiety, from time to time, to Lord *A.* for his own use and benefit. The Court of Exchequer, under the circumstances of that case, refused to assist the creditor in reaching the share reserved to Lord *A.* and held in trust for him. The Court seemed to agree with the counsel for the trustee, that property or stock in the funds, or in the hands of a trustee, which could not be taken on a *fi. fa.* at law, could not be taken by any process of equity to assist the execution, according to Lord *Thurlow's* doctrine, in *Dundas* v. *Dutens*. The *Chief Baron*

said, he once applied, on behalf of the crown, to have the assistance of equity in aid of an *extent,* to get at stock in the funds, and it was refused.

In respect to this *Exchequer* case, it may be observed, that the question, whether the deed of assignment was fraudulent and void under the 13 *Eliz.,* had been decided in the K. B. in favour of the deed, as being neither fraudulent in fact, nor fraudulent in law, and the case is reported in 5 *Term Rep.* 420. But the judges of the K. B. intimated, that after the scheduled debts were satisfied, *equity would direct the surplus or moiety reserved to Lord A., to be applied towards satisfaction of the other creditors.* The bill in the *Exchequer* was an injunction bill, to stay a recovery in trespass by the trustee against the creditor, for seizing the trust property in the hands of the trustee; and, therefore, the question, whether equity would follow the intimation of the K. B., did not directly arise in that case. The opinion of the judges was evidently in favour of the equity power to reach such property; and Lord *Somers,* in *Lewkner* v. *Freeman,* (*Prec. in Ch.* 105.) sustained a bill for the surplus, in a similar case, in favour of a single judgment creditor. And, surely, a debtor cannot place his estate in trust, to receive the issues and profits to his own use, without any power in the creditor, by any process of law or equity, to reach it. I am not willing to admit such imperfection in the administration of justice.

We have repeated *dicta* (but nothing more) of Lord *Eldon,* (9 *Ves.* 189. 10 *Ves.* 368.) to the effect, that Chancery does not give execution against stock, *eo nomine,* upon which there is no *lien;* and that stock cannot be attached in the life of the party, according to the language of Lord *Thurlow,* in *Dundas* v. *Dutens.* He said, that Chancery had no jurisdiction to give execution in aid of the infirmity of the law; yet, that under the bankrupt law, stock is got at, and, also, in the administration of assets. The Master

1820.

BAYARD
v.
HOFFMAN.

of the Rolls, in *Taylor* v. *Jones*, got at stock, through a doctrine which is very difficult to maintain, and which seems to have surprised Lord *Thurlow*. " If, therefore, the decision was to turn upon the latter doctrine, (meaning that in *Taylor* v. *Jones*,) I should wish," says he, " to look at those authorities."

The last case I shall notice in this series of judicial observations, and which are all to be traced up to the doubts of Lord *Thurlow*, is that of *M᷎Carthy* v. *Goold*, (1 *Ball & B.* 387.) in which the plaintiff, under a decree for the payment of money, sought for an order upon sequestrators, to attach the dividends upon bank stock standing in the name of the defendant. But this part of the application was abandoned without argument, and Lord Ch. *Manners* observed, that it had been very properly abandoned; for he had listened very attentively to Lord *Thurlow*, in *Dundas* v. *Dutens*, and he was clearly of opinion, that *choses in action*, of which description is stock, could not be reached by the process of the Court of Chancery.

The authority of the cases of *Taylor* v. *Jones*, *King* v. *Dupine*, and *Partridge* v. *Gopp*, may be considered as shaken, but they cannot be viewed as overruled by these subsequent doubts. The question was, also, much, and learnedly discussed, in *Simmonds* v. *Lord Kinnaird*, (4 *Vesey*, 735.) whether a *chose in action* was liable to sequestration on *mesne* process in equity ; Lord *Loughborough* gave no opinion upon it, but observed, that he wished the process could go to the extent desired, when one considered the immense mass of property that might be supposed in the kingdom, answerable for nothing. " Suppose," he observes, " a great landed estate was converted into an annuity upon the consolidated fund, no process can reach it, unless this Court can get at it. On the other hand, I am not aware of all the consequences of either impounding the money in the hands of the bankers, or making them pay

the money. Why not against the bank? Then it will go to all chartered companies."

It is remarkable, that in all the discussions in this last case, not one of the cases already cited are referred to.

If the case necessarily turned upon this point, I should not feel myself justified, from any thing I have hitherto seen, to abandon, without still more consideration, the authority of the analogous case of *Taylor* v. *Jones*. But this case may easily, and with more safety, be decided upon its own intrinsic circumstances. The assignment of the 28th of *January*, 1818, by *M. & O.*, to the plaintiffs *B. & B.*, in trust for the general creditors, was of all their estate, real and personal, and of all books, vouchers and securities relating thereto. All the interest of *M. & O.*, legal and equitable, as well as their rights in action, or as *cestui que trusts*, passed by such a general and sweeping assignment; and they exhibited the stock in question as property belonging to them in reversion, and intended to be passed by that assignment. Unless we can say, that a debtor absolutely insolvent, may voluntarily assign his stock to his wife and children, in utter exclusion of his creditors, and that such an assignment is valid in law, notwithstanding the statute, we ought to give effect to the claim of the plaintiffs. This is not the case of a creditor seeking the aid of the Court to satisfy his debt out of property not to be reached by process; but it is the case of general assignees of the estate seeking the recovery of all that estate, by virtue of the assignment made for the benefit of all the creditors. It is like the case put by Lord *Eldon*, when he says, that " under the bankrupt law, stock is got at." In short, here is the case of a voluntary settlement by an insolvent debtor, which is void under the statute, and here are his general assignees seeking the aid of this Court to recover property *to which they have a title.*

It is not necessary, therefore, to put the case upon the other ground taken by the plaintiffs' counsel, of a subse-

quent purchase for a valuable consideration, without notice of a prior voluntary conveyance. I shall, accordingly, declare, that the assignment to the defendants, *H. & C.*, is, as against the title of the plaintiffs, *B. & B.*, null and void ; and that the title of these plaintiffs, as trustees, for the purposes expressed in the deeds of assignment to them in the pleadings mentioned, is valid ; and the defendants, *H. & C.*, are decreed to hold the stock in the pleadings mentioned, subject, first, to the right of Mrs. *Murray*, to the dividends during her life, and then subject to the orders of the plaintiffs, *B. & B.* ; and that neither party have costs as against the other.

Decree accordingly.