Walworth, Circuit Judge.
The defendant Pierce was indebted to the complainants,, severally, in sums amounting in the whole to about $2,500. For the recovery of these demands, the complainants, in August, 1825, commenced suits thereon ; and obtained judgments in February thereafter. During the pendency of these suits, all the visible property of Pierce was levied upon by executions issued on judgments confessed in favor of, or obtained by other creditors ; and the executions on the complainants’ judgments have been returned wholly unsatisfied. During the pendency of the complainants’ suit, Pierce loaned to the defendants, Elliott and Archibald, between eleven and twelve hundred dollars, for three years, and sold to them a small quantity of ribbons, amounting to $25,50. Pierce was insolvent at the time of this loan ; and the complainants allege that these funds were put into the hands of Elliott and Archibald, to keep the same beyond the reach of his creditors ; and have filed their bill to have the funds in question applied to the satisfaction of their judgments. The cause is brought to hearing on bill and answer; and the questions presented for the consideration of this court are, First, whether, under the circumstances of the case, as disclosed in the answers, the complainants have any equitable claim upon the fund in question; (1) and secondly whether the prior' judgment creditors are entitled to a preference, and ought to have been made parties to this suit.
The general principles of equitable jurisdiction, in relation to property of debtors in the hands of third persons, have been so recently and so ably examined and discussed, both in chancery and in the court of errors in this state, that it would be useless for me to go over the whole ground ; *760 and *1 shall not attempt it. I shall content myself with endeavoring to apply the doctrine there established, to the particular circumstances of the case now under consideration.
The case of Hadden v. Spader, in the court of errors, (20 John. 554,) establishes this broad principle, that courts of equity have power to reach the property of a debtor which has been placed in the hands of a third person; and to cause the same to be applied in payment of the demands of judgment creditors, who are unable to obtain satisfaction thereof by the ordinary process of courts of common law; and that it makes no difference that such property was put out of the reach of the creditors before their judgments were obtained. The opinion of Judge Woodworth, which appears to have been adopted by the late Chief Justice Spencer and a majority of the court of • errors, in that case, carries the doctrine so far as to embrace ¿hoses in action and public stocks belonging to the defendant. And certainly the case of Taylor v. Jones, (2 Atkyn’s Rep. 600,) referred to in that opinion, and Edgell v. Haywood, (3 Atkyn’s 352,) which appears to have been overlooked by the counsel in that case, are authorities for saying, that property, not in itself liable to execution, if placed or left in the hands of third persons, to the injury of the creditor, may be reached through the medium of a court of equity. (See also 2 Kent’s Commentaries, 358.)
But it is supposed by the defendants’ counsel that the doctrine of Hadden v. Spader, as laid down in the opinion of Judge Woodworth, has been very much narrowed by the decision of the late chancellor, in Donovan v. Finn, (I Hopk. Rep. 59.) If there is any thing in that decision which conflicts with the opinion of the court of errors in the former case, I am bound to support the decision of the court of errors, it being the judgment of a court of dernier resort, to the adjudications of which all other courts in this state are bound to submit. It must be admitted that the reasoning of Judge Woodworth would extend the jurisdiction of courts of. equity much beyond what the late chancellor supposed was allowable; while, on the other hand, the *761 reasoning of chancellor Sanford would, undoubtedly, restrict the jurisdiction *of those courts within much too narrow limits. I think, with the late chancellor, that in an ordinary case, free from all fraud and injustice, this court ought not, on the application of an execution creditor, to deprive the debtor of the power of collecting his debts. There must, undoubtedly, be an unconscientious exercise of that power, on the part of the debtor; or some fraud, collusion, injustice, or wilful neglect on his part, to collect and apply his debts and choses in action to satisfy his creditors; or some other ground of equitable jurisdiction in relation to such debts or choses in action, to enable execution creditors, by the aid of a court of equity, to reach and apply the same in satisfaction of their judgments and executions. In the case of Donovan v. Finn, it is manifest the chancellor considered the legacy, to Finn, merely as an ordinary debt due from the executors. It does not appear that any fraud or collusion between him and the executors was admitted by the answer, or established by the testimony in that cause. It was a mere neglect on the part of Finn to collect the legacy left him by his brother; perhaps for the reason, suggested by his counsel, that he was unable to give the requisite security to the executors to indemnify them against the contingent claim alluded to in the answer. But I apprehend there was a sufficient ground of equitable jurisdiction in that case, not alluded to by the chancellor. The executors were trustees, in relation to whom the court of chancery had general jurisdiction, and the recovery of the legacy was a part of the ordinary jurisdiction of that court. (Edgell v. Haywood, 3 Atk. 352.) Again; the fact that a legatee was not able to procure the requisite security to indemnify the executors, would, of itself, form a strong ground for allowing the execution creditors to do it for him; so that the legacy might be collected and applied to the payment of his honest debts.
Every person should be permitted to exercise the most liberal and extended discretion as to the time and manner of disposing of his property, vesting the proceeds thereof, and of collecting his debts; provided he exercises that *762 discretion fairly and honestly in reference to the equitable right of his creditors, to be paid out of the same; and ° r 7 without any view or intention of delaying, hindering or preventing them from obtaining *their lawful dues and demands. But wherever he exceeds these limits of his legitimate authority and power over his property and funds; wherever there is reason to believe he has exercised that power with intent to delay, hinder, or defraud those who have a claim upon that property and those funds, for the satisfaction of their just demands, such exercise of power becomes unconscientious and inequitable; and a court of equity will then control and regulate its exercise in such a manner as to compel him to do justice to its creditors. (Per Savage, Ch. J., 5 Cowen, 580.) Such an unconscientious exercise of power, by the debtor, is considered a fraud upon his creditor. And where such a fraud has been actually committed by a debtor; where he has intentionally placed, or even left that property which ought to have been devoted to the payment of his honest debts, in the hands of a third person, with a view to elude the justice of the law, and this court, by its ordinary course of proceedings, can reach such property without doing injustice to any, it does not deserve the name of a court of equity if it has not jurisdiction to afford relief to the injured creditors.
From the facts disclosed in the answer of the defendants, I am pefectly satisfied that Pierce intended to put the money which he loaned to Elliott and Archibald, in a situation where he could have the use and benefit thereof, and still keep it beyond the reach of his creditors. At the time he loaned this large sum of money to them, for three years he knew he was insolvent. It was after the com plainants had commenced suits against him at law for the recovery of their debts ; he had suffered the whole of his visible property, which cost him between five and six thousand dollars, to be sold under the executions of favored creditors, for less than one fourth of its cost; when he had in his hands, or probably could have raised, upon Gates’ bill of exchange, from $1,500 to $2,000 ; and he had removed with his family to Ogdensburgh, for the pur *763 pose of being within the gaol limits. He loaned the money to be invested in a store of goods ; the interest was to be paid to him annually; and he was employed as the clerk in the store, at a salary of two hundred and forty dollars a year, and the use of a dwelling house for himself *and family. From these facts can there be any doubt of his intention to put his funds beyond the reach of the executions of his creditors, while he secured án annual income therefrom, for the benefit of himself and family ? '
But it is insisted that Elliott and Archibald were Iona fide borrowers of the money, without any knowledge of the fraudulent intentions of Pierce, and that for this reason the complainants’ bill cannot be sustained as against thém. They do indeed deny that they had any knowledge of the concerns of Pierce at the time they received the money ; and they also swear they were not informed as to the extent of his debts or his means of payment, and did not then know that he was insolvent. There being no replication, these allegations, in their answer, must be taken as true, if they are not contradicted by other facts admitted by them in such answer. They admit that at the time they received the money, they knew that Pierce had broken up his establishment where he had been trading at Rossie, and had removed with his family within the gaol limits of Ogdensburgh; they knew that suits had been brought against them by the United States for heavy penalties, for alleged violations of the revenue laws ; they knew that all his visible property, with the exception of his household furniture, had been sold on the executions of some of his creditors ; and that suits were also pending against him for debts due to others. This certainly was sufficient to put them on inquiry ; and, if the cause depended on this question alone, I am not prepared to say that I should consider them bona fide holders of this money. With all these facts before them at the time they dealt with Pierce, and other facts which must have been within their knowledge, if they made no inquiries as to his concerns, and as to his ability to pay his debts without the aid of these funds, that circumstance, of itself, is certainly calculated to throw great suspicion up *764 on the transaction. It looks very much like wilful and .intentional ignorance, which is a very common badge of fraud.
In the view I have taken of this case, it is not very ma terial to inquire whether Elliott and Archibald were or were not conusant of the fraudulent intentions of Pierce. The *who!e amount is still in their hands : and they have no equitable claim Upon, any part thereof. If the transaction was only fraudulent on the part of Pierce, and Elliott and Archibald had no knowledge of the intended fraud, and are bona fide holders of the fund, they must still, in equity, be considered trustees for the benefit of the execution creditors. And surely there cannot be any hardship or injustice in requiring them to pay the money to those creditors, at the times and in the • manner they have agreed to pay the same to Pierce. (Per Woodworth, J., 20 John. Rep. 570.)' Justice and equity certainly require the protection of innocent holders of property, which has been fraudlently transferred to them, or placed in their hands by the fraudulent debtor, without any notice of his intention, and without fault on their part. But a court of equity will never permit a shield which is properly interposed for the protection of a bona fide holder of the fund, to be improperly used for the benefit of the'fraudulent debtor. If a fraudulent debt- or sells his property to á bona fide purchaser, who has no notice of the fraudulent intent, he will be permitted to hold the property; but if any part of the purchase money remains unpaid, he will be considered in equity as holding such unpaid-purchase money for the benefit of those who have been defrauded by the sale. (Jewitt v. Palmer, 7 John. Ch. Rep. 65.) •
It is also objected that there are other judgment creditors who.had sued out executions prior to the executions of the complainants, and who are entitled to1 a preference; and that they should have been made parties. And the case of McDermutt and others v. Strong, (4 John. Ch. Rep. 687,) is relied upon to support that objection.
It is a sufficient answer to this objection, that it does not appear that the prior executions have been returned unsa *765 tisfied, or that the property levied on was not sufficient to pay them. The household furniture of Pierce was levied on by those executions, but, as appears by his answer, it was not sold; and the value of it is not stated, For aught that appears, it might have been sufficient to satisfy the balance due on those executions. At all events, if these favored creditors have chosen, without a sale, to abandon any part of the tangible *property 'of the debtor, which they had seised under their executions, neither law nor justice will permit them to resort to the equitable fond, claimed in this suit, to the exclusion of the complainants. It does not, therefore, appear by the pleadings in this case, that there are any creditors, except the complainants, who are in a situation to come into this court to obtain payment out of this fund. But I apprehend the principle contended for by the defendants is not correct, even if it did appear in this case that the prior executions had been returned unsatisfied. In the case of McDermutt and others v. Strong, after the plaintiffs had proceeded to judgment and execution at law, and the- sheriff had returned that he could not raise the money thereon, they filed their bill in chancery, to have their debts satisfied out of the fund in the hands of the trustee; and their suit in chancery had actually been pending several months before the debtor was discharged under the insolvent act, and made the assignment to the defendants, under which they claimed the trust fund, for the benefit of the creditors of the insolvent, generally. The complainants in that case had also given previous notice to the trustee that they intended to look to the trust fund to satisfy their judgments. And the chancellor, under those circumstances, very justly decided that the complainants, by their legal diligence, had acquired a specific lien upon the fond, and which éntitled him to a preference. It is evident from the report of that case, that the chancellor did not consider the issuing of the execution,-merely, as giving any priority; for the execution of one of the plaintiffs was issued in May, and that of the others in June, and yet the decree directs that, if the fund is not sufficient to satisfy both judgments, it shall be distributed among the *766 complainants ratably, in proportion to the amount due to each.
Where the property has not been levied on by the execution, or where it is of such a nature that it never could have been levied upon, or reached by an execution at law, the return of the execution' unsatisfied, will not, of itself, give the creditor a specific lien upon the trust property, or choses in action of the debtor. He must follow up- his execution by - the commencement of a suit in equity, or, at least, must give notice *of his claim, and of his intention to pursue the trust fund; or do some decisive act, showing such intent, before he can be considered as having a specific lien. The creditors whose legal diligence has continued to pursue the property of the defendant into this court, ate entitled to a preference as the reward of their vigilance. In Edgell v. Haywood, Lord Chancellor Hardwicke says, “The court does not proceed, in this ¿ase, on the ground of a specific lien, but only considers it a part of the property of the debtor, which the creditor cannot come at without the aid of this court. If, therefore, after judgment, or even after the fieri facias, the debtor had assigned this bona fide, and for a valuable consideration, and without notice, it would be good, and prevail against this creditor. But after a bid brought, and a lis pendens created as to this thing, such assignment could not prevail.” (3 Atk. 357.) So in Spader v. Davis, (5 John. Ch. Rep. 280,) even the holder of the fund, under an assignment which was fraudulent in law, was only held accountable for so much thereof as remained in his hands at the time of the commencement of the suit in chancery. And certainly there" can be no more injustice1 in considering the commencement of the first suit in equity, by an execution creditor, as giving him a preference there than there is in giving a preference to the creditor who has obtained a specific lien upon the property of his debtor, by a prior seisure on his execution at law. If the creditor whose execution is first returned unsatisfied, pursues the race of legal diligence, by the com mencement of a suit here, he will obtain the reward of his vigilance; but" if he abandons the pursuit, or lingers on the *767 way before he has obtained a specific lien, he has no right to complain that the plaintiff, in a subsequent execution^ has gained a preference by superior vigilance. And where, as in this case, the creditor in the prior execution makes no claim upon the equitable fund, surely the fraudulent debtor, or the trustees who have no interest in the question, should not be permitted to make such an objection.
1 shall therefore decree, that Elliott and Archibald pay to the complainants the amount of the note given by them to Pierce, together with the interest thereon, at the times and *in the manner prescribed therein for such payments ;
and also pay to the complainants the sum of $25 50, due for the ribbons received of Pierce, and the whole to be applied towards the satisfaction of the judgments of the respective complainants, ratably ; first retaining out of the same their costs of this suit, to be taxed. And under the particular circumstances of this case, Elliott and Archibald will not be charged with the costs of the complainants, or permitted to retain their own costs out of the trust fund.
Decree accordingly, (a)

 Vid. 2 R. S. 173, 4.

 For a further examination of this question in the English courts, and a review of the case of Edgell v. Haywood & Dawe, (3 Atk. 352,) see Otley v. Lines and others, (7 Price’s Exch. Rep. 274.)